Good morning, all. Our first case this morning is Planned Parenthood v. the Commissioner, General Fisher. Thank you, Judge Flanagan. May it please the Court. Indiana's prohibition on discriminatory abortion does not impinge on the abortion right as defined by Roe and Casey, properly understood. Separately, the requirement that fetal remains be treated as human remains legitimately advances government interests in respect for the fetus as a human being. I'll start with the discriminatory abortion statute. Under Casey, the Supreme Court articulated not once, not twice, but five times its understanding of the right to abortion that had been defined first in Roe as the right to bear or beget a child. Now, that defines an abortion right that has to do with a binary choice. Do I want a child or not? It does not extend to the right to choose which child to bear. It does not extend to a right to discriminate among children that a woman may bear. Now, Casey also reinforced the point that the Roe dimension of personal liberty that was protected by the Constitution was the event where the woman, despite her best attempts, despite attempting to avoid having a child, finds herself pregnant. Now, which is not to say that that's the only circumstance where the right comes into play, but it reinforces the point that what we're talking about with Roe and Casey is this binary choice. Whether the woman wants a child at all versus which child does she want. Roe itself refuted the idea that a woman may be entitled to have an abortion at whatever time, in whatever way, and for whatever reason that she chooses, further signaling that there is room for the government to regulate when it comes to the reason for having an abortion. You know, I want to just interrupt a little bit because I want to get a little bit of the background of where this legislation came from. I know about a month ago you argued here about parental notification and all. I happened to run across a brief, and I looked at it, and that law started in 1982. I introduced it. That was my last year in the State Senate. I didn't run for reelection. So I just wanted to show I understand some things about legislative history, even though Indiana doesn't deal with it. I just wonder, was this legislation, was there a model? Was there some other state? How did this come about? Well, I don't know that there's a model. I am aware, as we point out in our brief at page 23, that there are several states that have some restriction on discriminatory abortion. I think we point out eight of them, the ninth being Illinois, which was invalidated by agreement several years ago. Are those confined just to gender? Some are race. Some are sex. Some are sex only. The only one that I know of, well, there are two that I'm aware of that have to do with genetic abnormality, North Dakota and Louisiana, though Louisiana is only after 20 weeks. So it probably doesn't implicate the same interests that we have here. But most of the others are sex only, and maybe one or two also have race. But I think the larger question in terms of context is the advent of cell-free DNA testing, which makes the ability to test an embryo or a fetus for characteristics in a way that's much less dangerous and much less risky than it was 10, 15, 20 years ago, certainly if you go back to the time of Rowan Casey, where amniocentesis and even chorionic villus sampling would pose risks and so would be recommended only for subcategories of women, typically based on age. But now we see that the American College of Gynecologists is recommending it for, if not all, nearly all women, because of the less invasive nature of cell-free DNA testing. And given the testimony that we've got in the record from Dr. Stutzman of Planned Parenthood that 50% or more of women who have a fetus with some diagnosis of disability, typically Down syndrome, will terminate the pregnancy, I think this gives rise to a very big concern that permitting such abortions risks decimation of entire categories of disabled people, much as has happened in Iceland. Well, you know, your opponent, and I'll read their definition because I want you to address it, said that the, where it starts, is that the state claims that the right to abortion is a binary choice, arguing that only women who decide prior to conception that they are going to obtain an abortion, no matter what, are protected by the privacy right established in Rowe and reaffirmed in Casey. They go on to say, under the state's theory, women who originally welcomed a pregnancy but then determined to have an abortion simply are not protected by the right to obtain an abortion, no matter the circumstances. Now, is that a correct summary? No, it's not. I think that's a bit of a caricature of our position, quite frankly. Our position is that the, what we are permitted to do is to restrict abortion based on the characteristics of the fetus. If the woman thinks that she wants to have a baby before she becomes pregnant, becomes pregnant, and then decides for whatever reason, excluding the discrimination that we've outlined, then she is entitled to have an abortion under Rowe and Casey. But when you get into this area where it's based on the characteristics of the child and not the choice that I don't want to have a child, but I don't want to have this child, that's where we think the state's interest arises and certainly goes beyond the limits of the right recognized. Well, what do you call that? What do you say that, what kind of a pregnancy is that? In, I'm sorry, in which context? What kind of a pregnancy is it on this, I'll call it the second lap, the first time they really want a baby, now they don't want this one. Right. Well, I think if it's, boy, I thought I wanted a baby, but I don't want this baby, that's a discriminatory choice, I think, if I'm understanding your question correctly. Well, that's correct, but that's the problem, of course, that I have. And just another background where I come from, for about 35 years, my wife has been involved with a pregnancy health center, and now it's 30 places in 12 states. But all of that is based on the premise that there's an absolute right to have an abortion up to 20 weeks. And it's all based on choice, to encourage women to choose life, which it seems Casey even says that's okay. But you can encourage, you can do other things, but you cannot mandate or force something. Well, I think it's a little bit anachronistic in a way to attribute to the Supreme Court in Casey and in Roe the idea that they grappled with this issue. We simply did not have the pervasive and low-risk testing that we have today for characteristics of the fetus. They were never presented with this type of scenario. And indeed, that's where Roe said, this is not absolute. It left that door open on reasons. It particularly said that. So I think that there is that wiggle room that we've got that really has never been an issue for society to confront. But isn't that the Supreme Court that really has to do that? Can we really wind around and get to the point where it seems to be an absolute right? Well, no. I think the Supreme Court has already said it's not an absolute right. And I think what the Supreme Court, only the Supreme Court, can do is extend the right to cover this type of situation where it's discriminatory based on the characteristics of the fetus. You mean they'd have to expand the mandate, whatever you want to call it? That's right. That's our view, is that they have not gone this far. They have left open, and certainly in Roe, and based on the sort of concurring rhetoric in Casey, that this is a limited right, the right to choose whether to have a child. And it is not absolute and does not apply anywhere, what is the term, whatever time, whatever way, and for whatever reason, which Roe disclaimed. So we think the court hasn't gone as far as Planned Parenthood needs them to go to win this case. And that only the court can go that far. Well, the thing, getting back to this, a woman who has a pregnancy, I know my daughter is going to have a baby in six weeks, we call it a baby. It's fetus stuff, you know, okay, whatever people are comfortable with. But a woman pregnant with a baby or fetus, 17 weeks, there's an awful lot going on there. And an ultrasound, for example, will define that pretty clearly. And in the experience of the Women's Care Center, when a woman does see the ultrasound, a lot of times she does change her mind. And that's one of the things I'm looking at, because it seems to me the woman that has that perfectly healthy pregnancy at 17 or 18 weeks has an absolute right to terminate it, even though there's nothing wrong with it. And then when we get to this case, where we're talking about there are things wrong, you know, here I go again, my wife and I are godparents of her brother's youngest child who has Down syndrome. He's a lively kid, he's a great example, but there again, there's an absolute right the way we presume it. And I'm struggling with that, because I know an awful lot about this issue, and have always gone on, don't like it, but nevertheless, there's an absolute right. And how do you overcome that? Well, I think if the court concludes that Roe and Casey provide that absolute right, that it extends this far, we don't overcome it. So we have to find a reason to, as you put it, they've got to go a step further before they have that. They can stop this one. Yeah. I think our position is Roe and Casey have not gone this far. If they have gone this far, then right. Well, General Fisher, if we look at the post-Casey cases, do we see in any of those cases room for the kind of analysis that would permit the interpretation you advance? In other words, haven't most of the cases seemed to speak about that first trimester decision as one where not a limited inquiry is made, but no inquiry is made. I'm just trying to find where in the post-Casey case law we would see room for the kind of analysis you propose. I'm not sure why we would expect any of the post-Casey cases to shed light on this. I mean, Casey is important, not just because it's an abortion case, but because it's specifically grappled, once again, with the core right to abortion. And so it and Roe really are the touchstones for this. And going back, even if you follow the Casey discussion, back to Eisenstadt. And Eisenstadt was the first case that talked about this right to beget a child. The post-Casey cases, including whole women's health, didn't really have to get into the fundamental nature and whether this right exists. It's a question there of what sort of peripheral regulations the state may bring to bear. So I don't think we would expect that. Now, I think in terms of lower court cases, what we've seen in the briefing are circumstances where the statutes have been invalidated because they go right at this binary choice. Is it based on, for example, in the McCormick case from 2015, the Ninth Circuit, trying to redefine the time in which the abortion is permissible. Instead of viability, then it's a certain fixed time frame. Other cases typically get into the same issue. So non-emergency abortions, that sort of thing. Statutes that get into the right itself, the core right identified by Roe and Casey, this binary choice. I don't want a child. I do want a child. Which way is it? We don't have cases that get into an abortion decision based on the characteristics of the child. And I think that's the critical distinction. If one were to assume that the state interest exists in this case, how can the inquiry be made into the decision? Well, I think the principle, if you will, enforcement mechanism here really brings up the First Amendment issue in the case, which is the advisory provision where the physician or the appropriate designate of the physician advises the woman that Indiana law prohibits an abortion solely on the basis of race, sex, disability, etc. And I think the theory, as a woman hears that, and if that was her main motivation, she will think twice. Now, there is a reporting requirement that if it is known that there's a diagnosis of disability, it has to go on the termination report. But we don't see that as a mandatory invasive inquiry. It isn't going to be known in every circumstance. And I think the woman's going to have time to reflect on her choice. And I think the main thought here is, if we can prohibit it and advise the woman it's prohibited, then perhaps we will convince some not to proceed. Is there some way then that, my own experience vicariously, in one of the cities there's a woman who runs a women's care center. And if a woman who's pregnant with even an unwanted pregnancy gets in the door and counseling and stuff, when they see the ultrasound, hear the heartbeat, see the image, you can see the eyes and the nose and the arms and all the other things, it's magnified, but nevertheless they see it, they frequently change their mind. Now that is consensual, it's not forced, it's not government, it has all of the trappings of a successful, you can call it anything you want, rescue or something. But it's not forced, but to give the woman the opportunity to have an ultrasound, is there some way the state can persuade or provide it or make that available? For instance, what happens, what is it, 24 hour waiting period? 18. Is that correct? 18 is, 18 hours. 18 hours. Well, what do they do in that 18 hours if there were a way to, I guess you'd have to say persuade, give them a total opportunity to get a free ultrasound? And in Bloomington and in Indianapolis, the women's care center is right next door. Now, they'd have to schedule and do some other things and maybe that wouldn't work. But I'm just trying to think of a way to put a woman in front of a place where she can make her best choice by hearing the other side of somebody being an advocate for the baby. Well, we're certainly trying on the ultrasound, and as Your Honor pointed out, that's the subject of a different case, and that's part of the overall kind of matrix of laws. I'm not very familiar with the other case. So without, I don't want to get into that. I don't want to digress. I'm just looking for a way to have the woman the opportunity, the same type you're talking about. She's discovered, she's either got a Down syndrome baby or spina bifida or like one of my niece's children has half a heart, but they managed to put it together. She happened to be in the right place in Milwaukee where they had the expertise to do it. She's now 11 years old, but otherwise would have died in about four days. So just to put the person in front, to give her an equal opportunity to know that there is something, there's an alternative to the abortion that may be the right thing to do. The required counseling includes alternatives to abortion. The list of material that the clinic and the physician, the physicians designate, must discuss with the woman in some form or fashion includes alternatives to abortion, and this would be added to that. It would be an advisory essentially that an abortion for these reasons is illegal. Now, there is no compulsion that the woman undergo any kind of testing to detect whether there is some sort of fetal anomaly. And so it's not as if we are trying to figure out with each baby what's going on and then force the woman to sort of confront that. It's a question really of, you know, if she's there and that's what's on her mind and she hears that advisory, hopefully, you know, the state views that that will prompt a reconsideration. Well, see, the thing, if a woman is, I don't know, in that situation, see, this is also a mandate on the doctor, too. I don't want to be cynical, but if the person who detects it's not going to be the abortion clinic who detects you've got this malady, would it be something for them to say, if you want an abortion, don't tell the doctor why you want it? Well, look, I'm not, you know, I'm not an expert on medical ethics and I don't think, but I think it's important that, especially given the viewpoints of some of the amici in this case, to point out exactly what Your Honor's just said, which is that you're talking about different settings where the detection and the counseling on the genetic counseling side is going to come up versus where the abortion comes up. Now, Planned Parenthood is not restricted to the items in the informed consent statute in terms of what they discuss with women. So they have their own ability to bring their own viewpoints and to bring their own ways of dealing with each individual patient. But under this law, if someone goes into the abortion clinic and tells the abortion doctor, let's stick with Down syndrome, she just simply doesn't want a baby that has Down syndrome. And the doctor would say, why'd you tell me that? She would just walk in there and say, I want an abortion. And they would, I guess, give her the abortion. And that's, I ask these questions because obviously this is a very challenging, probably everybody in this room has an opinion on abortion and it's divided our country for a long time. It just so happens by coincidence that my whole married life, I vicariously understood the objective was to persuade, never to force, always to just give an opportunity for the woman to have an alternative. And the ultrasound has been pretty remarkable. When you see the image and the beating heart and everything, a lot of young women don't even realize that's what's going on. And once they see that, they say, wow. And then there are a lot of them come back and got the baby and they think, now that's the sunny side. That's my side or whatever, just from the point of view. But we have the Supreme Court and that's what we got to deal with. And I'm having a hard time finding a way around it. Well, I've mapped it out for you as best I can in terms of our view of the limits on Roe and Casey. But I think that is what it comes down to is, are we correct about those limits or not? And if we are, then we should prevail on this. And if we're not, then I don't know that we've got the ability. General Fischer, looking at the language of 1337, are we to read into that the obligation of the abortion provider to make these inquiries? I mean, to start the dialogue? What is the command of 1337? No, I don't think that there is an obligation to initiate that conversation. In terms of the report that has to be made, it's phrased in terms of whether the fetus has been diagnosed or has a potential for diagnosis. Now, again, that report isn't meant to be the be-all end-all of what's on the woman's mind. But that reflects the kind of hard and fast side of what the physician has to report. But I don't see in there any mandate that the physician initiate that discussion. So, if a woman goes into the clinic for an abortion, if everyone remains silent, does 1337 have no effect? No, I don't think it has no effect. Again, I think the one thing the physician cannot do is not give the advisory. You have to give the advisory that the state prohibits discriminatory abortion, however it's phrased. I think the hope is, even if nothing else about the potential for diagnosis or diagnosis is set. So, the medical provider initiates some dialogue by having to inform as the statute. Well, yes, that's true, but it's not particularized necessarily. So, you're saying it doesn't call for a response from a woman. Right, right. The hope is that, nonetheless, it will have an impact. Well, even in the admitting privilege case that we had a couple of years ago, one of the main issues was the ultrasound. And from my point of view in that case, it was a huge benefit. First of all, the woman knows that she's pregnant. She's not going to get paid for an abortion when she's not pregnant. And then she would also see what the situation is and have a doctor. This is on admitting privileges. A doctor who will follow her if she's got a problem. And not just she's out the door and don't see it again. Because the other side of our goal, you know, we start with the prenatal and all of the baby clothes and parenting classes and a whole lot of other things that go along with her point of view. But that's all I'm looking at is when it gets in the abortion clinic. And I'll explore that with them to know exactly what the procedure is and what they do with that ultrasound. Do they let the women see? Back then I used to say turn the screen. Do they see and hear the heartbeat and realize what is actually going on before they go ahead with the abortion? That's part of our matrix of laws that that is supposed to happen. And, again, the timing of it is subject to one of the cases currently before the court. Sure. I do want to mention before I sit down. The other side. What do you do with the remains? What do you do with the remains? Right, exactly. And the district court's view is that because the fetus is not a person under the 14th Amendment, the state has no legitimate interest in treating it as a human being. And I don't see the court has never held that those two things are the same. And just because there isn't a 14th Amendment protection for the fetus doesn't mean the state can't insist on dignified treatment as a human being. Even the Supreme Court in Gonzales referred to a fetus as a living organism while within the womb, whether or not it is viable outside the womb. Now we're looking at a rational basis. We are looking at a rational basis. So it's a little different. And this is not an imposition on, I hesitate to say, the mother, the woman, because it's her decision if she wants to do something else with the remains, I guess. Yes, yes. Okay. And so then the other thing is there's an obligation for the doctor to identify all and make sure he's got all the pieces. And that's, I think, standard practice anyway. That's exactly what they do. That's what I mean. You've got to do that, because otherwise you can't leave some residual in there. So I don't know anything about that, you know, the vacuum and all. At every stage there's a different obligation. But the doctors have to do that. They do. And Dr. Stutzman, who had initially said that he didn't see a distinction between fetal remains and other, you know, human surgical waste was. . . You're well into your rebuttal time. If I may complete this thought, then I'll sit down. I will do that. Thank you. And the point, though, in the deposition was he recognized that there are distinguishing physical characteristics between the aborted fetus and other remains of surgery. So I think that any observation that's necessary is quite obvious and bears out the requirement that this is a human being, that the state can require to be treated with respect after the abortion. I'll reserve the remainder of my time. Thank you. Thank you, General Fischer. Mr. Falk. Thank you, and may it please the Court. It is hard to imagine an area of the law that is more certain than the absolute right of a woman to obtain an abortion previability. And the law here that we are challenged seeks to ignore that clear law. Casey reaffirmed as a central principle of Roe that before viability, the state's interests are not strong enough to support a prohibition on abortion or imposition of substantial obstacle. Casey further held that, and I'm quoting, a state may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability. Now, it is true, of course, and both Roe and Casey and subsequent cases have stressed this, that the state does have an interest in protecting potential life. But Casey says that the means chosen by the state to further its interest in potential life must be calculated to inform the woman's choice, as Judge Mannion noted, not to hinder it. Well, here, of course, we're talking about a prohibition. We're not talking hindrance. We're talking about an absolute prohibition. And the binary choice theory has no place here. The woman has an absolute right as part of her privacy interest. The whole point about privacy, we are told in Casey, is that the privacy erects a realm into which the state may not enter, period. And, of course, here, the state is seeking to do exactly that. The state is presuming to be able to examine the reasons why a woman is seeking a pre-viability abortion and then saying, well, we're sorry, those reasons aren't good enough. We're not writing on a clean slate here, Your Honors. The law from the Supreme Court is absolutely clear. That would violate what the court has noted is the essential holding of Roe. The woman's right to terminate her pregnancy before viability is the most central principle of Roe, the court tells us. It is a rule of law and component of liberty which we cannot renounce. In the states, one of the green briefs, I'll call them, we get a lot of them. We seem to attract them. One of them pointed out that there are some states that have in place I'll just stick with gender, where you can't abort a child because it's a girl. That's correct. There are, I believe, seven states, maybe eight that have that as a requirement. Have you challenged any of those? And the reason they have not been challenged in those states, Your Honor, is that I don't know if any of those abortions ever occur. I don't know if anyone has standing. The reason we're here today challenging all these bans is that, at least for the gender and the race ban, which we have no evidence is going on, the court has to reach the constitutionality of that ban because of the First Amendment claim. Because remember, we all agree here that if it is unconstitutional to have that ban, it's unconstitutional to require Planned Parenthood to inform them of that ban. I would guess that those bans have not been challenged because they're simply, it doesn't come up. Now, there was a challenge that was dismissed on standing grounds, and, of course, there was an Illinois case in the 70s, I believe, which we cite, where, as part of the settlement, it was agreed not to enforce that ban. Someone objected to the settlement saying that, this was post Casey, I'm sorry, so it wasn't the 70s, but someone objected to the settlement saying that you should be able to maintain a sex-selective ban, and the court there said, in approving the settlement, no, under Casey, we simply can't inquire prior to viability. But that's probably why those statutes are there, Your Honor. But I assume that you would oppose it if this person had standing. Well, yes, Your Honor, because, of course, I have no right to inquire as to why a woman is seeking an abortion pre-viability than the state does. Well, you don't. I mean, like, you're the lawyer, but I mean the doctor for Planned Parenthood. That's correct. I guess this is a, it's not a double standard. The Down syndrome issue, what is it, the baby's featured now? Somebody, I should have written this down, there's a Down syndrome baby who is featured. Oh, for the first time in a national, I saw that. Yeah, it's kind of cute. But it just emphasizes there is a life and there is something to this child. And obviously, just like my own, I have a very good friend who also has a Down syndrome child. And when you see the child alive and kicking, so to speak, and how the impact he has on other people, et cetera, is so positive that it's hard to anticipate that until you see it. And obviously, you know, my youngest, I'm old, but my youngest is 19. And my wife was 42 when he was born. And he's perfectly healthy and wonderful and everything's great. But I can understand the dilemma when a parent is notified that there's something wrong. Yes. And it's scary. It's shaky. Yes, and I think the state is completely well within its rights to do everything possible to inform and educate the woman, to inform the choice. But ultimately, the Supreme Court tells us the choice is left to the woman, in consultation with her doctor, of course. And that's the line that Casey draws. Casey and Roe and Whole Woman's Health don't leave any room for the state to come up with a new reason to supplant the woman's right in the first trimester to obtain an abortion because Casey says, no matter what the interests are, we've considered all the interests. They simply are not strong enough to overcome the woman's absolute right in the first trimester. But Casey does stress that the state can attempt to advance its interests in fetal life by all sorts of means calculated to inform the woman's choice but not to hinder it. And that's the language that we sort of rest on. We look at, okay, what can they do to persuade? And I go back to the ultrasound. Yes. Because I think, at least the experience we had, I'm not familiar with what Indiana does. But as far as the abortion clinics, do they do an ultrasound and do they let the client, patient, see and hear? Yes. Indiana law requires that all women obtained be given an ultrasound and also listening to the heart unless the woman declines in writing. I see. So she has to affirmatively say no. Exactly. I don't want to see that or hear that. Exactly. And the other litigation we have, we actually have the percentages of that, and I frankly don't remember. I apologize. Well, the thing, and of course you may not know, but do you happen to know the number nationally that abortions that Planned Parenthood performs? I do not. The only statistics I've seen is it's hundreds of thousands. They're the leading abortion provider in the country. I believe so. The numbers have been going down, but yes. That's good too. But I think in Indiana, I believe there are three clinics. Is that right? There are. Bloomington in Indianapolis and Hammond. Well, Planned Parenthood has three clinics that perform surgical abortions and a fourth clinic that performs in Lafayette that performs medication. The surgical also do medication. And there's a dispute in South Bend right now. There's a dispute in South Bend, and I think there are two other abortion providers in Indianapolis who are non-Planned Parenthood. And actually, an abortion provider doesn't have to be putting up advertisements. I don't think. You know, he can be a doctor who does them. Yes. And, you know, they're a physician and it's legal. That's true. They have to file the same report. Maybe some of those too. I don't know. But, obviously, this is a major issue, and it's in every campaign. Every politician has to say one way or the other what they're going to do. That isn't the reason I quit. Well, it's a difficult issue, but the Supreme Court, I think, has made this particular case or this aspect of the case simple. First trimester, the woman has an absolute right. It is part of the privacy that a woman has, period. The state's interest clearly to preserve potential life exists, but the state can only exercise that interest by informing the woman, not by erecting this type of prohibition. Well, of course, you know, I'll keep adding all of my personal stuff. My one sister-in-law had a child at 24 months, and it lived one year. I'm sorry, one month. She had another one that went 28 months. It was very expensive, but he's 6'3". So, you know, you can look at both of those, and those are very difficult pregnancies. So when you talk about viability, we all recognize viability is very tentative. That is correct. Even at 24 weeks, he lived one month. That is correct. What do you call it? Neo-nail and all that stuff. Very expensive treatment. So you have that aspect of it, too. I'm not denying that this is an easy subject. Well, that's correct, and science is doing things in this area, but, of course, Planned Parenthood limits its abortions prior to 14 weeks, so there's no question that the fetuses are not viable. And all the discussion that we're having here involves a woman's private choice in consultation with her physician, something the state has no ability or no right to enter. The court also properly concluded that the tissue disposition requirements violate due process. This is low-level, rational basis scrutiny, of course. The question is, are we talking about something that is rationally related to legitimate interest? The state says... Rationally related to what? Rationally related to a legitimate state interest. And the state says legitimate state interest is, and I'm quoting from its brief, the fetus is a human being who should be given a dignified and respectful burial or cremation. But the fetus is not a human being. The Supreme Court in Roe made it clear that the unborn have never been recognized as persons. This court and co. held that the unborn are not persons. And, in fact, the Supreme Court in Akron, citing back to Roe, stressed that the state may not adopt one theory of when life begins. The state has adopted a theory of when life begins and has built a statutory edifice on that construct. But that is not a legitimate governmental interest because the state cannot declare when life begins. Well, what do they call it then if it's not an unborn person? Well, they're saying it's a human being. They're saying that when this tissue is extracted, either through an abortion or through a miscarriage, it has to be treated, it has to be buried, it has to be cremated. And the reason for it saying that is it is claiming that this was a person. And the Supreme Court has said no. That is not a choice that the government can make. That is a theory, and the government cannot presume and impose that theory on individuals. And then the state says, well, we are saying this is human life. But, by the way, if the woman wants to, she can take the tissue and dispose of it the way she wants. And if you accumulate the tissue at a clinic, you can cremate it altogether. So, on the one hand, the state is saying this is human life. On the other hand, it's not treating it as human life, which is not rational. What can you call it that they could still have the remains done, whatever they want to do with them, but is there some other word? What do you call something that isn't human life because it can't live outside? It's not viable. What do you call it? It's potential life, but when that life leaves that tissue, and we're talking about tissue, when that life leaves that tissue, it becomes a byproduct. Because most of them have a beating heart. Well, again, I'm not going to, the record doesn't discuss, and we're talking about tissue that may be in just weeks in development. Yeah, that's not a mystery. Sure. These are all things that we can calculate. Of course. And it's just looking at it from, say, well, the mistake was that they called it a person instead of calling it some pre-born something or other. The mistake, Your Honor, is characterizing that as a human being that was alive, and it never was, and even in Gonzales, the court objected to the abortion procedure in Gonzales because it involved the partial birth of a child before the abortion. The court had no problems with fetuses of the same development being aborted within the womb or the uterus. The court was not making any statement as to the fact that the remains were life. The court was objecting to this one method of abortion. But here, as I said, on the one hand, you have the state saying, we proclaim these are human beings, but by the way, if the woman wants to take it home and dispose of it any way she sees fit, that's fine. But that's not how we treat deceased human beings. We're not allowed to take a deceased human being from a facility and dispose of it as we see fit. We're not allowed to cremate deceased human beings together. We treat them with dignity and respect because of what they were when they were alive. Would you treat that as any other body part that is disposed of carefully? Yes, that is how prior to the law it was treated. It had to be disposed of hygienically. It was disposed of generally through incineration, through cremation. The only difference here now is that the cremation has to occur in a funeral home or crematory, and then Planned Parenthood has to dispose of the ashes, which is a big difference. But we're still not dealing with a human being, and we cannot build a statute on that edifice, and therefore the district court should be affirmed. That's all I'm saying is that instead of calling it a human being, what do you call it? And again, Your Honor, I just— It's different than a diseased gallbladder, for example. There's something else you take out, the kidney or something that has to be removed because it's damaged or something. And when it comes to the pregnancy, the doctor has to make sure, whatever it's a D&C or something, that you got everything. Yes. And then has to do something with it. And I think Planned Parenthood, maybe you were complaining that it costs a few bucks, $12 or something, to do that extra effort. I don't know if that's the case or whatever, if it's a big deal. We are not claiming this is an undue burden because of cost, Your Honor. We are claiming that this is irrational because— Okay, it's got to be that in your case. I'm sorry? It's got to be irrational. Yes. Well, we concede at this point we are claiming this violates due process low-level scrutiny. That's not rationally related to a legitimate governmental interest. And we are claiming, of course, that the court found that there is neither legitimate governmental interest nor is there rationality. Thank you very much. Thank you, Mr. Falk. Thank you, Your Honor. Just a couple of points. I think going back to Roe for the understanding of what's happening in the womb prior to viability ignores all of the biology that we've learned since then. We know that a zygote is a human organism with characteristic human parts and a human pattern of developmental behavior, namely an organization towards the production of a mature human body. And the Supreme Court has recognized as much in Gonzales. And it is, I think, an unusual thing to say that we are somehow in the land of rational basis restricted by what is going on in the law of abortion. What are the remains to be called by some medical definition? Instead of saying it's a human life? Well, look, it says it's a human being. Indeed, in the Rounds case out of the Eighth Circuit in 2008, the court upheld the informed consent provision that instructed that the woman be advised that the fetus was a human being. Now, I think what we see is some alighting between human being and life. When does life begin versus human being? I think human being is meant to be strictly scientific and less with a sort of moral gloss on it. But in terms of how we treat the remains, that is something the state is entitled to do under its police power. We don't need to rely on the definitions in the scope of the 14th Amendment. Well, of course, another problem is frozen embryos. Frozen embryos can live. They can be then inserted and a child develops. The scary thing is that there may be an artificial placenta created where you put that in there and somehow or other it becomes irrelevant about abortion because there's some separate mechanism. And it's scary. I don't even like to think about it. But there are a lot of things happening in technology and medicine, et cetera, that these things, that viability may be a lot sooner. But we're not there, and obviously this is a perplexing situation. I just was just looking for something else. Maybe the name is calling it a person. It can be substituted so that at the same time the disposal or how you treat the remains would be okay on a rational basis. I don't think we have to get hung up on what we call it. I think the police power is sufficiently broad that we can take account of differences among even that which we don't ascribe some moral sense to. We can prescribe how we demolish historically relevant buildings so that the history of it is respected. We can do all kinds of things in the name of public sensibility within the police power. So I wouldn't get hung up on exactly the terminology that we use here. This is something that's well within the state's authority. Now, the court, Judge, you mentioned a little scary about thinking about some of those developments in medicine that seemed like science fiction not too long ago. But I want to leave the court with something that's not quite so scary, which is that the acute baby you referred to is the new Gerber baby. Is what? The new Gerber baby. Gerber baby, yeah. All right. If there's nothing else, thank you. All right. Thank you. Thanks to all counsel. The case is taken under advisement. The court will proceed to the next hearing.